

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**
**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**

**The following constitutes the order of the Court.**

**Signed January 6, 2006**                                    **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

```
IN RE:                          §
                                §
CHARLES D. SCHMIDT, JR.,        §    CASE NO. 05-84993-RCM-7
                                §
    D E B T O R (S).            §
```

**MEMORANDUM DECISION ON MOTION TO COMPEL**
**ABANDONMENT OF PROPERTY BY CAROLYN SCHMIDT**

**Procedural Background**

This matter was heard on December 19, 2005, and taken under advisement.

On October 14, 2005, Charles D. Schmidt, Jr. ("Debtor") filed his voluntary petition under Chapter 7 of the Bankruptcy Code.[1] On November 7, 2005, Carolyn Schmidt ("Carolyn"), spouse of Debtor, filed her motion to compel abandonment of property (the "abandonment motion") and motion for expedited hearing thereon. James Cunningham, Chapter 7 trustee (the "trustee"),

---

[1] Debtor's first § 341 meeting is scheduled for February 7, 2006.

opposed such abandonment motion. Laureen Schmidt ("Laureen"), former wife of Debtor, also filed opposition to such abandonment motion.

This is a core proceeding under 28 U.S.C. §§ 1334 and 157(b)(2)(A), (B), (C), (E), (H), (N), and (O). The foregoing and following are the court's findings of fact and conclusions of law under Bankruptcy Rules 7052 and 9014. Where appropriate a finding of fact shall be construed as a conclusion of law and vice versa.

Before their marriage, Carolyn and Debtor entered into a prenuptial contract (Debtor Ex. 1) on October 9, 1989 (the "prenuptial agreement"). Title to the two real properties in question--a house and lot at 7009 Chevy Chase, Dallas, Texas (the "Chevy Chase property") and a townhouse at 6129 Bordeaux Ave., Dallas, Texas (the "Bordeaux property"), was taken in the name of Carolyn Schmidt from the time of purchase. *See* Debtor Exs. 3, 7. The Chevy Chase property deed of November 4, 1993 was to Carolyn P. Schmidt, a married person (Debtor Ex. 7). The Bourdeaux property deed of March 3, 2005 was to Carolyn Schmidt (Debtor Ex. 3). Both properties were purchased during the marriage of Carolyn and Debtor.

Laureen's opposition to such abandonment motion was based upon her judicial lien rights arising out of her abstract of judgment lien for $37,350 plus $3,325 attorney's fees and costs

recorded in November 1997 in the abstract of judgment records of Dallas County, Texas. *See* Laureen Ex. 4. Such judgment was a liquidation of her alimony claim against Debtor and remains unpaid.

On November 28, 2005, a hearing on the abandonment motion was commenced and as a result thereof an agreed order (the "agreed order"), addressing the sale of the two properties in question and rescheduling this hearing for December 19, 2005 on the abandonment motion, was entered. In the agreed order, the foregoing parties agreed that the Chevy Chase and Bordeaux properties would be sold with the court to make a determination of ownership of the net proceeds. The Chevy Chase property was purchased in the name of Carolyn Schmidt, a married person, in 1993. *See* Debtor Ex. 7. This was the house in which Carolyn and Debtor were living on the date of his bankruptcy. It was factually undisputed that the Chevy Chase property (Debtor Ex. 7) was the homestead of Carolyn prior to Debtor's bankruptcy and up through the sale thereof. As indicated, the Bordeaux property was purchased in the name of Carolyn in March 2005. *See* Debtor Ex. 3. She and Debtor were going to move into this house after selling the Chevy Chase property, but the sale of the Chevy Chase property was not completed prior to Debtor's bankruptcy. By that time, economics apparently forced Carolyn to sell both properties. In his bankruptcy, Debtor never claimed that either

such Bordeaux or Chevy Chase property was his homestead.

The agreed order provided that the following orders would be applied to the sales and disposition of sale proceeds from the two properties:

1. The Chevy Chase house and lot would be sold for $430,000 per Carolyn's contract of sale.
2. The Bordeaux property would be sold under the existing, as modified, contract of sale of Carolyn P. Schmidt/Arcata Inv. Inc., for the sale price of $320,000.
3. Such proceeds from the aforementioned sales would be used to pay all current unpaid liens of record and taxes against such properties and all closing costs, with the balance of proceeds to be paid to the trustee, less a payment of $2,000 to Carolyn on each property.
4. In the event that, after hearing, the court determined that Carolyn should not have been paid such $4,000 or $2,000 thereof, then Carolyn was obligated to pay same back to the trustee.

In order to expedite the trial of this matter, it was further ordered by agreement that the national and local bankruptcy rules pertaining to contested matters would apply to the trial of the remaining disputes between the parties with respect to disposition of the net sale proceeds on the two properties.

By all sides expediting the trial of this matter in the way they have, they boiled the issues down to a trial on the main issue of who owns the approximate $120,000 net sale proceeds from the sales of the two properties rather than strictly a technical motion to compel abandonment under 11 U.S.C. § 554. In such manner, normal adversary trial litigation approaches were expedited and somewhat altered, but not to the detriment of any party.

**Further Background**

At the time the prenuptial agreement was executed on October 9, 1989, Debtor was aware of Laureen's suit pending against him for past due alimony. As such time, Carolyn was aware of Debtor's issues with Laureen, but Laureen's judgement against Debtor was not entered until April 1990. *See* Laureen Ex. 3.

The prenuptial agreement was never filed for record in the real property records for Dallas County, Texas, or in any other county. Movant and Debtor married on October 12, 1989. Sometime in 1989, but before the execution of the prenuptial agreement and before the marriage of movant and Debtor, Laureen instituted litigation for collection of monies owed to her by Debtor. *See* Laureen Ex. 2. This litigation resulted in the judgment on April 23, 1990, for Laureen against Debtor referred to above.

As a result of the sale of the two properties authorized by the agreed order, the trustee currently holds net proceeds

received which are as follows:

1. $60,019.33 from the Chevy Chase property and
2. $60,445.16 from the Bordeaux property.

### Summary of Legal Positions of Parties

Carolyn asserts, among other things, as authority for the requested abandonment, that the estate has no interest in the properties because the agreement makes the two parcels of real estate her separate property and not property of the estate. Laureen claims an interest in the proceeds by reason of her recorded abstract of judgment against Debtor on her prior judgment. Because her abstract of judgment lien was only against Debtor and he was not titleholder of either piece of property, it appears that Laureen's abstract of judgment lien did not attach to the proceeds of either sale.

The trustee asserts that the agreement is not controlling on the issues or binding on the trustee because the agreement is not a conveyance of the two parcels of real estate by Debtor to Carolyn inasmuch as:

1. the properties were not in existence as of the day of the execution of the agreement;
2. the agreement does not contain an adequate description of the properties allegedly as required by Texas law for the agreement to constitute a conveyance of real estate in Texas; and/or,

    3.    the agreement does not contain operative words of grant, as required by Texas law, showing an intention of the grantor to convey title to the two parcels of real estate to the movant as the grantee thereof.

Alternatively, and without waiving the foregoing, the trustee contends that if the agreement constitutes a conveyance, it is void as to the trustee because the trustee's strong-arm powers pursuant to § 544 of the Bankruptcy Code and because the agreement was not recorded as required by § 13.001 of the Texas Property Code, which states in pertinent part as follows:

> (a) A conveyance of real property or an interest in real property or a mortgage or deed of trust is void as to a creditor or to a subsequent purchaser for a valuable consideration without notice unless the instrument has been acknowledged, sworn to, or proved and filed for record as required by law.
> (b) The unrecorded instrument is binding on a party to the instrument, on the party's heirs, and on a subsequent purchaser who does not pay a valuable consideration or who has notice of the instrument.

TEX. PROP. CODE ANN. § 13.001 (Vernon 2004).

Alternatively, the trustee contends that if the agreement constitutes a conveyance, it is void as to the trustee because it constitutes an undisclosed, concealed fraudulent transfer that was not discovered until the movant's motion was filed. *See* TEX. BUS. & COM. CODE ANN. § 24.001-.013 (Vernon 2004).

The trustee additionally asserts that the agreement, for the reasons set forth above, is not controlling; that the properties are jointly managed community properties of the movant and

Debtor; that the properties have not been claimed as exempt by Debtor; that 11 U.S.C. § 522(g) prevents Debtor from hereinafter attempting to claim either of the properties as exempt; that the properties are, therefore, property of the estate in accordance with § 541(a)(1), (a)(2)(A) and/or (a)(2)(B); and that the proceeds thereof should be turned over to the trustee.

The prenuptial agreement of Debtor and Carolyn, entered into on October 9, 1989 before their marriage on October 12, 1989, contains the following provisions, among others:

5. <u>Earnings and Income</u>
   (a) <u>Income or Property Derived from Separate Property.</u> All the income or property (whether from personal effort or otherwise) arising from the separate property owned at the date of our marriage by either of us, or that may later be acquired, shall be the separate property of the owner of the separate property that generated that income, increase, property, or revenue.
   (b) <u>Earnings</u>. All salary, earnings, and other compensation for personal services or labor received or receivable by either of us, now or in the future, shall be the "special community" property of the party who performed the services or labor and received or is due to receive the salary or other compensation.

6. <u>Living Expenses</u>
   During the time the parties are married, CHARLES D. SCHMIDT, JR. agrees to use his special community funds for reasonable day to day living expenses such as food, clothing, shelter, utilities, medical, transportation, travel, recreation, entertainment and all other normal and customary items relating to the household and personal needs of the parties. To the extent either party may wish to expend his or her special community or separate funds for additional expenses such as clothing, travel, recreation, entertainment or other items above and beyond

their reasonable day to day living expenses, either party may do so.

7. Liabilities

All liabilities and obligations (contingent and absolute) of either of us that exist at the date of our marriage shall be enforceable against and discharged from the separate property of the party who incurred the particular liability or obligation and shall not be enforceable against or dischargeable from the property of the other.

8. Future Property
(a) Jointly Owned Property. It is our intent that during our marriage, we will from time to time by mutual agreement acquire jointly owned separate property but not own any community property. Any jointly owned property will be jointly owned by our respective separate estates. Any property that is acquired by either of us during our marriage, regardless of the source of the consideration exchanged for the property, will be owned only as separate property or special community property of the party in whose name the title is taken and will be free of any claim of reimbursement on the part of the other. If the evidence of title reflects both our names, that property will be owned by us jointly as tenants in common on behalf of our respective estate.
(b) Credit Purchases. Any property purchased on credit will be the separate property of the party in whose name the title is taken. If there is no evidence of title, the party to whom the credit was extended shall own the property and be solely responsible for paying any purchase-money indebtedness with that party's separate funds. If title to the property is taken in both our names, we shall both be responsible for paying any purchase-money indebtedness with our respective separate funds.

9. Reimbursement

Any payment or contributions by one of us to satisfy the debts or otherwise benefit the separate estate of the other shall not give rise to a claim for reimbursement or an interest in any property purchased by those payments unless we

>  otherwise agree in writing. Any right of
>  reimbursement that may arise during our marriage
>  for payments or contributions made to the other's
>  separate estate to the extent any payment is made
>  by one for the benefit of the other shall be
>  presumed to be a gift to the other party's
>  separate estate.

Before marrying Debtor on October 12, 1989, Carolyn had been previously divorced in 1985 and had two sons, ages 21 and 16. She testified that she had $2 million in assets after her divorce in 1985, including a house on Normandy. She credibly testified that her wealth came from her previous divorce.

In 1993, title to the Chevy Chase property was taken in her name "Carolyn Schmidt, a married person" (Debtor Ex. 7). Carolyn and Debtor signed the deed of trust as "Borrower" (Trustee Ex. 1). Carolyn paid the down payment on the Chevy Chase property from her sale of her prior Normandy house and from her separate property.

Debtor signed the Chevy Chase mortgage (Trustee Ex. 1), but supposedly not the mortgage note. In 1997, Atlas Foundation Company did work on the Chevy Chase property, and both Debtor and Carolyn signed the mechanic's lien contract as borrower.

In December 2001, the Chevy Chase property was refinanced and Carolyn took $70,000 cash out, and Debtor and Carolyn signed the security agreement and loan papers as borrowers (Trustee Ex. 6). In April 2003, the note on the Chevy Chase property was refinanced again, and the loan papers were signed in the same manner (Trustee Ex. 7).

Carolyn testified that from 1993 until the Chevy Chase property was sold, she paid the mortgage payments, taxes, and upkeep. During the marriage, Debtor gave her money for utilities, gas, shopping, and other household expenses.

In January 2005, Carolyn signed a contract to buy the Bordeaux property (Debtor Ex. 2). The Bordeaux property was thereafter purchased, and she made the $63,000 down payment. The $63,000 down payment came from funds from her mother, Mrs. Cox. Carolyn made the mortgage payments on Bordeaux from her prior divorce funds and from a $30,000 loan from her brother.[2]

After purchase of the Bordeaux property, Carolyn and Debtor never moved into the Bordeaux property. In March 2005, they signed the deed of trust on same, but "borrower" is shown as Carolyn Schmidt and "joined by her husband, Charles Schmidt signing pro forma to perfect lien." (Trustee Ex. 8.)

The trustee produced records showing approximately $37,400 in checks written to Carolyn by Debtor during the period of January 2003 through June 2005, and also deposits into Carolyn's account during the period of June 2003 through October 2005 of $52,731 with reference as being from Debtor. (Trustee Ex. 22 at 1.) Also, the trustee produced records of household expenses paid by Debtor during January 2004 through January 25, 2005 of

---

[2] Neither of the two real properties were mentioned on the schedules to the prenuptial agreement. They had not been purchased the time such agreement was signed. Neither of such properties were listed on Debtor's bankruptcy schedules.

$13,693 for household expenses (*id*. at 5, 6) for items such as maintenance, SBC, TV, Terminex, Dallas News, etc.  The trustee also produced records of Debtor's checks to cash for the period of January 2003 through November 21, 2005 of $28,995 (*id.* at 7-9), approximately $28,000 of which was prepetition.

In addition, the trustee produced various records relating to Silver Partners, a corporation formed by Debtor sometime during the 1992-1995 time frame.  Debtor put $60,000 into the Silver Partners business, and Carolyn received the only stock issued.  Silver Partners was a wholesale jewelry catalogue business, which ceased business sometime during August-September 2004.  During its existence, Debtor and Carolyn apparently both worked for it and got paid out of this business.  While the Silver Partners transactions could be discussed, it would add nothing substantial to the issues decided with respect to the two properties in question.  *See id.* at 2-4.

Because of the expedited manner in which these matters were tried, this opinion and judgment in connection therewith are intended to ultimately address only the ownership of sale proceeds of the two properties, abandonment, and whether the agreement was a fraudulent conveyance.[3]  This opinion and the judgment in connection therewith are not intended to be res

---

[3] In that connection, the court has reviewed the Silver Partners transactions and determined that the facts of such transactions do not adversely impact the court's decision on ownership of the sale proceeds from the sale of the two properties.

judicata or collateral estoppel with respect to other possible issues between the parties.

### Was the Prenuptial Agreement a Fraudulent Transfer Under the Texas Uniform Fraudulent Transfer Act?

As previously indicated, when Carolyn married Debtor, she generally knew of Debtor's issues with his former wife, Laureen, over delinquent alimony.

Many of the underlying facts have been previously discussed. The court finds that the agreement was not a fraudulent transfer.

Limitations would not apply to this claim by the trustee because, among other reasons, of the discovery rule. *See Duran v. Henderson*, 71 S.W.3d 833, 839-40 (Tex. App.--Texarkana 2002).

Even if a homestead is separate property, absent unusual circumstances, neither spouse may convey or encumber same without the joinder of the other spouse. TEX. FAM. CODE ANN. § 5.001 (Vernon 2004); *see* 39 TEX. JUR. 3D *Family Law* § 272 (2005).

The agreement was not a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act ("TUFTA"). Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE ANN. § 24.001-.013 (Vernon 2004); *see Calmes v. U.S.*, 926 F.Supp. 582 (N.D. Tex. 1996).

It does appear that Debtor was insolvent at the time he entered the agreement because he was not paying his debts as they became due. TEX. BUS. & COM. CODE ANN. § 24.003(b). He knew of his obligation to Laureen and was not paying it. *See generally Beck*

*v. Beck*, 814 S.W.2d 745 (Tex. 1991).

In *Calmes*, the court stated:

> Subsequently, amendments to the Texas Constitution allowed spouses to partition then existing community property. Texas Constitution, art. XVI, § 15 (1948, amended 1980). Spouses are also allowed to agree that all or part of their community property becomes the property of the surviving spouse. Texas Constitution, art. XVI, § 15 (1987). Most importantly, the Texas Constitution has been amended to allow spouses and persons about to marry to partition or to exchange their interests in property then existing or to be acquired in the future. Texas Constitution, art. XVI, § 15 (1980, amended 1987). Article XVI provides, in pertinent part:
>
>> [P]rovided that persons about to marry and spouses, without the intention to defraud pre-existing creditors, may by written instrument from time to time partition between themselves all or part of their property, then existing or to be acquired, or exchange between themselves the community interest of one spouse or future spouse in any property for the community interest of the other spouse or future spouse in other community property then existing or to be acquired, whereupon the portion or interest set aside to each spouse shall be and constitute a part of the separate property and estate of such spouse or future spouse; spouses also may from time to time, by written instrument, agree between themselves that the income or property from all or part of the separate property then owned or which thereafter might be acquired by only one of them, shall be the separate property of that spouse . . . . *Id.*
>
> Initially, some question remained as to whether the definition of "property to be acquired" effectively encompassed future personal earnings thereby making this type of personalty susceptible to premarital partition or exchange. However, recent judicial decisions and sections of the Texas Family Code [FN2] have made the fact that personal earnings are subject to partition or exchange abundantly clear.

>In *Winger v. Pianka*, the Austin Court of Appeals was presented with the issue of whether the amendment to Article 16, § 15 allowed persons contemplating marriage to partition future earnings. 831 S.W.2d 853 (Tex.App.-Austin 1992, *writ denied*). In that opinion, after a thorough analysis of the amendment's text, the voters' intent and discussions concerning the amendment by the Texas Supreme Court, the Austin court held that the 1980 amendment to Article 16, § 15 of the Texas Constitution clearly permits persons about to marry to partition or to exchange between themselves salaries and earnings to be acquired by the parties during their future marriage. *Winger v. Pianka*, 831 S.W.2d 853, 858 (Tex.App.-Austin 1992, *writ denied*).
>
>Jack Calmes and Susan Bagwell Calmes executed their premarital agreement on September 6, 1989. Although the question of the applicability of the 1980 amendment was not clearly settled at the time of the agreement, Texas law has now established that parties contemplating marriage may partition their future earnings.

926 F.Supp. at 585-86 (footnote omitted).

TUFTA § 24.005(a)(1) provides that a transfer of property is fraudulent if the "<u>debtor</u> made the transfer or incurred the obligation with actual intent to hinder, delay or defraud any creditor of debtor." (emphasis added). There was insufficient proof of such intent by Debtor. Debtor was insolvent at such time and had no money to buy a house. Carolyn made the entire down payment, and the house and tax payments. Carolyn was attempting to protect her own significant separate property rather than intending to hinder, delay or defraud Debtor's creditors.

The badges of fraud are set forth in TUFTA § 24.005(b). Under § 24.005(b)(1), the transfer was to an insider. Although

-15-

Carolyn was not married to Debtor at the time of signing of the agreement, it appears that she was an insider within the meaning of TUFTA § 24.002(7). *See Browning Interests v. Allison (In re Holloway),* 955 F.2d 1008 (5th Cir. 1992); *Calmes,* 926 F.Supp. at 589.

Carolyn took title to both properties in her own name. (Debtor Exs. 3, 7). She paid the down payment on both pieces of property. She paid the mortgage payments and taxes on both properties. Debtor paid utilities, gas, some repairs, and some miscellaneous expenses.

In the limited issues before the court, the trustee did not attempt to isolate specific Debtor expenses as fraudulent transfers or otherwise in specific amounts traceable into either property in any amount entitling the trustee, if it would, to payment of any quantifiable sum from the net proceeds.[4]

The Trustee argues that the agreement was concealed. *See* TUFTA § 24.005(b)(3)(highlighting concealment of a transfer or obligation as a badge of fraud). While the agreement was not recorded, the titles to the real estate interests in question were taken in Carolyn's name in both instances and were a matter of public record. *See* TEX. BUS. & COM. CODE ANN. § 24.005(b)(3). Neither property had been purchased by Carolyn at the time of

---

[4] For possible proof problems for the trustee in this area, see *Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145 (Bankr. W.D. Ky. 2005).

signing the agreement. Debtor received reasonably equivalent value at the time of signing of the agreement as required by TUFTA §§ 24.005(b)(8), 24.006(a).

The agreement was not fraudulent and was not entered into with actual intent by Debtor (or Carolyn) to hinder, delay or defraud a creditor of Debtor. *See id.* § 24.005(a)(1). The trustee has not proven that the agreement was a fraudulent transfer under TUFTA.

## Conclusion

Under 11 U.S.C. § 554(b), after notice and a hearing, the court may order the trustee to abandon any property that is burdensome to the estate or of inconsequential value to the estate. The proceeds of the two sales of real property are found to not be property of Debtor's estate and of no value to the Debtor's estate. Carolyn is found to have been the owner of such real properties at time of sale and entitled to the proceeds of the sales. The Chevy Chase property is also found to have been the homestead of Carolyn at the time of Debtor's filing bankruptcy and sale of same. At the time of sales of the two properties, Laureen's abstract of judgment lien did not attach to the proceeds of either sale.

The trustee is ordered to abandon such proceeds and turn same over to Carolyn.

Judgement will be entered in accordance with this opinion.

###END OF MEMORANDUM DECISION###

###END OF MEMORANDUM DECISION###